**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| Eric Westerfield,<br><br>Plaintiff,<br><br>v.<br><br>GEICO Advantage Insurance Company,<br><br>Defendant. | Case No. 4:26-cv-01528-SRC |

## Reply to Support Motion to Remand

The Petition seeks "the net premium attributable to the addition that GEICO Advantage collected and retained after all refunds and credits attributable to the addition." Doc. 5 ¶ 50 & p. 14 (Plaintiff cites to page numbers as assigned by CM/ECF). GEICO does not calculate that. Instead, every GEICO calculation uses "instances" multiplied by estimated elapsed days and Westerfield's initial $2.20 daily "charge" or "overcharge." Doc. 23-1. Because the calculations do "not fit the allegations in the complaint," they are "fundamentally flawed." *All-South Subcontractors, Inc. v. Sunbelt Rentals, Inc.*, 2015 WL 4255781, at *6 (M.D. Ga. July 14, 2015) (citing *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 761 n.19 (11th Cir. 2010)).[1]

This district has rejected a CAFA calculation that "fail[s] to adhere to the claims as presented in the complaint." *City of O'Fallon v. CenturyLink, Inc.*, 930 F. Supp. 2d 1035, 1042 (E.D. Mo. 2013). GEICO's calculations fail for the same reason, so the Court should remand. *Id.* at 1044; *Lizama v. Victoria's Secret Stores, LLC*, 36 F.4th 762, 766 (8th Cir. 2022).

[1] The Eighth Circuit has approvingly cited *Pretka* in *Waters v. Ferrara Candy Co.,* 873 F.3d 633 (8th Cir. 2017) and *Raskas v. Johnson & Johnson*, 719 F.3d 884, 886-87 (8th Cir. 2013).

**1. GEICO must value the net retained premium the Petition puts in controversy.**

The amount in controversy is contested, so the Court weighs the parties' proof under the preponderance standard. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 88–89 (2014); *Leflar v. Target Corp.*, 57 F.4th 600, 603–05 (8th Cir. 2023). At "the evidence-weighing stage," GEICO Advantage must show a factfinder might legally conclude more than $5 million is in controversy. *Leflar*, 57 F.4th at 604. Plaintiff's legal-certainty burden only comes after the evidence-weighing stage. *Lizama*, 36 F.4th at 765.

GEICO's showing must address "not only what the stakes of the litigation *could be*, but also what they *are* given the plaintiff's actual demands." *Hartis v. Chicago Title Ins. Co.*, 694 F.3d 935, 945 (8th Cir. 2012) (citation omitted). The Petition demands the Policy-Level Loss, defined as the net premium attributable to an addition that GEICO collected and retained after all refunds and credits, excluding unrelated changes and duplicate recovery. Doc. 5 ¶¶ 50–51. Class membership requires GEICO's retention, after all refunds and credits, of more than $0 of premium. *Id.* ¶ 48. Plaintiff does not seek every amount "charged" or "overcharged." *Id.* ¶¶ 8, 48–51.

*Lizama* applies the rule applicable here for disputed CAFA estimates. There, actual instead historical tax collections supported a projection of future collections, but not the inference that enough future purchases would come from members of the defined class. *Lizama*, 36 F.4th at 764–65. Without evidence supporting that connection, the estimate failed. *Id.* at 765–66. The question here likewise concerns the evidentiary connection between GEICO's calculations and the loss this Petition defines.

*CenturyLink* identifies the same threshold problem present here: calculations that "fail to adhere to the claims as presented in the complaint." 930 F. Supp. 2d at 1042. There, the defendants combined business-license taxes with franchise fees, although the complaint sought only unpaid business-license taxes. *Id.* at 1042–44. The defendants' failure to differentiate between the two

amounts left the court to speculate whether the jurisdictional threshold was met. *Id*. at 1043–44. Even apart from that commingling, evidence of taxes paid did not establish the taxes unpaid that the plaintiffs sought. *Id*. at 1044. The defect concerned the financial measure, not precision.

GEICO leaves the same evidentiary gap. It multiplies "instances" by estimated elapsed days by an initial premium "overcharge" without identifying what portion was collected and retained after attributable refunds and credits—or supporting a reasonable estimate of that portion. Doc. 23-1 ¶ 5. The Petition seeks only net retained premium from qualifying rated-driver-addition transactions. Doc. 5 ¶¶ 48–51. GEICO need not calculate every account to the penny, but its "instance" counts and estimated duration figures do not establish the missing net retained premium.[2]

*All-South* also illustrates the flaw in GEICO's calculations. There, the defendant's revised declaration identified more than $16 million in collected fees. But the complaint challenged only the portion exceeding the defendant's costs. *All-South*, 2015 WL 4255781, at *3–7. The court distinguished *Raskas* and other aggregate-sales cases because the calculation did not conform to the complaint's specific allegations. *Id.* at *4–5. Relying on *Pretka*, it explained "[a] declaration [that does] not fit the allegations in the complaint" is "fundamentally flawed." *Id.* at *6.[3]

The *Waters* court approvingly cited *Pretka*'s reasonable-extrapolation standard yet rejected an executive's quantified injunction-cost estimate because material assumptions were unexplained. 873 F.3d at 636. Together, these decisions allow approximation while also requiring an evidentiary connection to the recovery sought by the pleading.

---

[2] *CenturyLink* also declined to infer class membership from evidence showing where the defendants did business without establishing the pleaded ordinance criterion. 930 F. Supp. 2d at 1039–40. Here, the selection question is whether GEICO's "instances" applied the express "rated-driver-addition transaction" criterion in the Petition when Hoskins's declaration omits that part of the definition. Doc. 23-1 ¶ 3.

[3] *Pretka* was explaining *Thomas v. Bank of America Corp.*, 570 F.3d 1280 (11th Cir. 2009): a declaration of all fees did not establish the value of a complaint that did not seek every fee from every customer. 608 F.3d at 761 n.19.

**2. GEICO's calculations do not establish rated-driver days or net retained premiums.**

Hoskins identifies over 16,000 License-Address addition "instances," including more than 6,500 in which the driver "remained" on the policy for at least 365 days. Doc. 23-1 ¶ 3. GEICO multiplies 6,500 × 365 × $2.20 to reach $5,219,500—only $219,500 above the jurisdictional threshold. Whether the counted instances and days generated attributable premium that GEICO collected and retained therefore matters to the jurisdictional result. Each input is disputed.

Hoskins's alternative calculation is closer to the jurisdictional floor. For more than 2,200 "instances" with nonmatching surnames that she says remained on policies at filing, Hoskins multiplies 2,259,697 elapsed days by an "overcharge rate of $2.20," yielding $4,971,333.40—$28,666.60 below the threshold. *Id.* ¶ 5. Paragraph 6 adds $182,160 by multiplying 450 other "instances" by 184 days and $2.20. *Id.* ¶ 6. Together, those groups yield $5,153,493.40. A reduction of just 3% would bring that estimate to $4,998,888.60. As explained below, Hoskins supplies no evidence establishing how many counted days involved rated status or connecting the initial "overcharge" to attributable premium collected **and *retained*** after refunds and credits. Those omissions concern inputs capable of determining whether either calculation exceeds $5 million.

**2.1. GEICO has not established the rated-driver counts or days.**

The Petition requires a "rated-driver-addition transaction" and limits class membership to accounts where GEICO collected and retained more than $0 of premium after refunds and credits. Doc. 5 ¶¶ 48–49. Hoskins quotes the address-matching criterion but omits the other requirements from her description of the counted population. Doc. 23-1 ¶ 3. She then measures how long a driver "remained on the insured's policy," without identifying how many of those days the driver remained **rated**. *Id.* ¶¶ 3, 5–6. That distinction determines whether the counted days can support GEICO's premium calculation. A person's continued presence on a policy does not establish a continuing, retained premium attributable to that person.

GEICO's public filings with state regulators distinguish listed persons from rated drivers. The Kansas, Texas, and Missouri definitions, by way of example, exclude specified classifications from rated-driver status, and public records show credits following an exclusion and subsequent retroactive cancellation of driver status. Doc. 30-5 at 3, 7, 13; Doc. 30-4 at 3; Doc. 30-6 at 7 ¶ 11; *see also* Doc. 30-3.[4] Hoskins identifies no status filters, status histories, or other evidence supporting a reasonable inference that the counted "instances" remained ***rated*** throughout the estimated durations used in her calculations. That evidentiary gap affects every GEICO calculation, including the 6,500-event cohort and both alternative cohorts. Doc. 23-1 ¶¶ 3, 5–6.

GEICO's public responses illustrate the difference between listed and rated. GEICO has explained a person may remain on the policy "as an active driver with a learners permit," while "they are not rated until they obtain a fully active drivers license." Doc. 30-1 at 3. Unrated drivers "do not impact the policy premium." *Id.* at 6; *see also* Doc. 30-2 at 2, 4. One documented example reflects at least 335 days of continued listing without a premium effect. Doc. 30-2 at 4. These examples establish that continued listing, even as an "active" driver, is not synonymous with continued rating that goes to the amount in controversy. Whether these permit holders and other listed, non-rated drivers entered Hoskins's License-Address cohorts remains unknown and disputed.

*Lizama* and *CenturyLink* reject estimates lacking evidence connecting the calculation to the pleaded class and recovery. 36 F.4th at 766; 930 F. Supp. 2d at 1043–44. GEICO likewise supplies estimated durations without evidence supporting a reasonable inference that enough of those days were **rated**-driver days to sustain its jurisdictional calculations. Its own public statements show "remaining" on a policy—even as an "active" driver—can generate ***no*** additional

[4] Doc. 30-5 contains documents publicly available through the National Association of Insurance Commissioners by visiting SERFF Filing Access for each state: https://serff-sfa.naic.org/serff/sfa/home/KS, https://serff-sfa.naic.org/serff/sfa/home/TX, and https://serff-sfa.naic.org/serff/sfa/home/MO. The search fields to locate the documents are shown at Doc. 30-5 at 1, 5, and 10.

premium. Multiplying the undifferentiated days by $2.20 leaves the necessary connection unsupported. GEICO therefore has not established by a preponderance of the evidence that its counted days place more than $5 million in controversy. Remand is justified.

### 2.2. An initial "overcharge" does not establish the premium ***retained***.

Westerfield disputes the number of "instances" and estimated "durations" for the reasons stated in the motion to remand and here, but even accepting every "instance" and day were rated, GEICO must support its monetary daily rate. Hoskins multiplies those instance-days by Westerfield's "alleged daily overcharge." Doc. 23-1 ¶¶ 3, 5–6. The Petition alleges a $13.19 premium increase for six days, payment, and that GEICO "did not fully refund" the increase. Doc. 5 ¶¶ 40–42. That $2.20 daily overcharge does not quantify even Westerfield's retained loss. Yet GEICO applies that initial charge across its cohorts without identifying aggregate receipts, attributable adjustments, or a retained-premium average.

GEICO also invokes Hoskins's declaration from *Westerfield I* claiming the average added "expense" of a youthful driver exceeded $2.72 per day. Doc. 23 at 10; *Westerfield v. Gov't Emps. Ins. Co.* (*Westerfield I*), 2026 WL 2144550, at *4 (E.D. Mo. July 27, 2026); *Westerfield I*, Doc. 40-1 ¶ 7. But the earlier benchmark does not establish an average for License-Address additions for GEICO ***Advantage***, much less the premium collected and ***retained*** from those additions.[5] Hoskins claims that "charges" vary significantly with age, experience, vehicle, location, and driving record. Doc. 23-1 ¶ 7. Even assuming the earlier benchmark supports using $2.20 to estimate an initial premium "overcharge," GEICO must still support the connection between that "overcharge" and the premium ***paid*** and ***retained*** after credits and refunds.

[5] Hoskins's earlier testimony described an analysis of "GEICO's policy premium increases" for insureds receiving Risk Alert additions. It did not identify an Advantage-specific average for License-Address rated-driver additions. Although her current declaration carries forward other testimony, it neither repeats the $2.72 figure nor explains whether the earlier analysis represents the population counted here. Doc. 23-1 ¶¶ 3–7.

GEICO's own rules identify the financial variables that its calculations leave unresolved. Its Kansas and Texas manuals average individual rated-driver factors and apply the result to the policy's vehicles; household factors also depend on driver counts and characteristics. Doc. 30-5 at 3–4, 7–8. Texas expressly adds or deletes the rating plan attributable to an operator added or deleted midterm. *Id.* at 9. Kansas requires a refund when a policy change produces return premium. *Id.* at 2. These provisions identify changes in both the attributable charge and the amount retained that elapsed days alone cannot measure or reasonably estimate under *Lizama* and *CenturyLink*.

Public records show why accounting for refunds and credits is central to the pleaded amount in controversy. In a Maryland Risk Alert proceeding, a $363.84 prorated premium was followed by retroactive removal and a $377.80 credit. Doc. 30-6 at 6–8, 15. The ALJ found that "the additional premium billed to the Complainant was removed." *Id.* at 15.[6] GEICO's October 2025 public response likewise describes a $131.68 increase followed by credits of $101.03 and $30.65 that eliminated it. Doc. 30-4 at 3. Those transactions show why an initial "overcharge" and elapsed listing days do not establish the ***retained*** premium in controversy.[7]

The documented reversals reveal the missing evidentiary link: an addition can remain on a policy for many days while the attributable increase is later reversed. The declarations identify no basis to estimate the money **collected *and* retained** after those adjustments. Counting more additions or days does not supply the financial premise that connects GEICO's calculations "to the claims as presented in the complaint." *CenturyLink*, 930 F. Supp. 2d at 1042.

[6] Plaintiff relies on this proceeding for its documented rating calculations, retroactive removal, and account adjustments, not its resolution of liability under Maryland law.

[7] The rating rules and public records show refunds are not "pure speculation" like GEICO suggests. Doc. 23 n. 3. The net premium paid (i.e., after refunds and credits) is what the Petition puts in controversy and GEICO makes no effort to calculate it.

GEICO's burden requires a supported estimate of the loss pleaded. The present declaration provides "instances" and durations but "no evidence to support a reasonable inference" as to the collected ***and retained*** premium after credits and refunds. *Lizama*, 36 F.4th at 766. Remand is justified even if the Court accepts GEICO's "instances" and estimated durations.

**3. GEICO's cases do not fix its unsupported financial inference.**

GEICO repeatedly quotes *K.A.*'s statement that a defendant need not banish uncertainty. Doc. 23 at 2, 5–6, 14. That case granted remand. *K.A. v. Child.'s Mercy Hosp.*, 2018 WL 6445417, at *2–3 (W.D. Mo. Dec. 10, 2018). The hospital used the named plaintiff's $253,870 medical bill, alleged typicality, and national healthcare costs to attribute only $2,000 in bills to each class member. The court rejected this purportedly "very conservative estimate" as speculative because the plaintiff alleged "similar injuries . . . not that she and the class have similar medical bills." *Id.* at *2. Neither typicality nor a conservative figure supplied the missing financial connection.

*Hartis* first established a representative monetary loss, then addressed transaction volume. The plaintiffs alleged that Chicago Title retained $3 and $21 in excess recording funds after paying the governmental recording fees. *Hartis*, 694 F.3d at 939–40. The court examined allegations that class members shared the same relationship, experienced "identical" conduct, and would have damages calculated in the "identical fashion." *Id.* at 945. Those allegations supported treating the $12 average as representative of the class's retained overcollections.

The court then explained its sequence: "Having determined that a $12 overcharge is representative of the class pursuant to the Hartises' complaint, we now look to the complaint to determine how many transactions are at issue." *Id.* It analyzed the allegations concerning transaction volume and the frequency of overcollections, ultimately multiplying 603,500 estimated transactions by the representative $12 loss. *Id.* at 945–46. Allegations supporting both inputs yielded the $7,242,000 estimate.

GEICO's calculation lacks that foundation. Westerfield alleges an initial $13.19 increase, payment, and an incomplete refund; his retained loss remains unquantified. Doc. 5 ¶¶ 40–42. Paragraph 57 expressly distinguishes typical liability from average amounts and durations. GEICO nevertheless applies the initial $2.20 daily charge throughout its calculations. Its additional counts and duration figures address the multiplier while leaving the representative monetary amount unsupported. Unlike the $12 retained overcollection in *Hartis*, Westerfield's initial charge does not quantify even his own retained loss.

GEICO's cited aggregate-sales cases began with actual financial amounts corresponding to the recovery claimed. *Raskas* accepted medication sales despite the objection that only discarded and replaced medications were actionable. 719 F.3d at 887–88. *Dammann* accepted collected premiums on policies containing the challenged deductibles, extending beyond insureds who had received allegedly inadequate benefits. *Dammann v. Progressive Direct Ins. Co.*, 856 F.3d 580, 583–85 (8th Cir. 2017). *Brunts* accepted a declaration of product sales exceeding $5 million and rejected an effort to limit recovery below the purchase price placed in controversy by the pleadings. *Brunts v. Walmart, Inc.*, 68 F.4th 1091, 1093–95 (8th Cir. 2023). Unlike GEICO's cases, Plaintiff assumes the amount-in-controversy includes every qualifying addition and seeks the full attributable premium GEICO retained. GEICO supplies neither a corresponding retained receipts figure nor evidence supporting its substitute daily rate.

*Scherrer* accepted an extrapolation after jurisdictional discovery produced actual labor-depreciation (what was in controversy) figures for 5,482 claims totaling approximately $3.5 million. The insurer extrapolated those figures to 9,271 claims. *Scherrer v. Foremost Ins. Co.*, 2018 WL 1508904, at *1–2 (E.D. Mo. Mar. 27, 2018). The court rejected more precise averages and proposed deductions for duplicates and amounts ultimately paid. *Id.* at *3. Its estimate nevertheless

began with measured amounts of the challenged depreciation. Here, GEICO counts events and elapsed days, then applies an initial charge without establishing its relationship to retained premium. The defect concerns whether the monetary input measures the claimed loss. *Scherrer*'s rejection of refinements to a supported estimate does not resolve that antecedent question.

*Doss v. Am. Fam. Home Ins. Co.*, 47 F. Supp. 3d 836, 839–43 (W.D. Ark. 2014), used actual claim payments and the named plaintiffs' adjuster summaries to construct four estimates of depreciated labor; statutory penalties, punitive damages, and fees supplied the balance. *Allen Beth Inc. v. Waste Connections US, Inc.*, 667 F. Supp. 3d 956, 957–59 (E.D. Ark. 2023), used service-rate revenue and customer payments, a surcharge estimate accounting for customers who did not pay that charge, and recoverable fees. Although it rejected a demand for a more accurate methodology, the accepted estimate had a financial foundation tied to the pleading's disputed surcharge.

GEICO's cited tax cases likewise rested on actual receipts or supported calculations of the pleading's disputed excess. Home Depot supplied $17.48 million in taxes collected; even the plaintiff's lower estimate exceeded $3.9 million before punitive damages and fees. *Waters v. Home Depot USA, Inc.*, 446 F. Supp. 3d 484, 491–93 (E.D. Mo. 2020). *Femmer* initially rejected a uniform overcharge rate because a common scheme did not establish a common rate. *Femmer v. Sephora USA, Inc.*, 2020 WL 5632443, at *3 (E.D. Mo. Sept. 21, 2020). It denied remand after revised sales-based computations, assumptions left unchallenged in reply, and available punitive damages and fees. *Id.* at *3–4.

In *Schott v. Overstock.com, Inc.*, 2021 WL 148875, at *3–5 & n.2 (E.D. Mo. Jan. 15, 2021), Overstock reran historical transactions through its tax software using applicable state and local use-tax rates. The resulting $818,790.13 differential followed the plaintiff's proposed approach and went unchallenged in reply; fees and punitive damages brought the total above $5 million.

Here, Plaintiff disputes Hoskins's supplemental calculations because the revised counts and durations leave the rated-status and retained-premium assumptions unresolved and unknown.

Finally, *Faltermeier v. FCA US LLC*, 899 F.3d 617, 621–22 (8th Cir. 2018), upheld a supported repair valuation plus recoverable fees. *Pirozzi v. Massage Envy Franchising, LLC*, 938 F.3d 981, 983–84 (8th Cir. 2019), rejected a prediction that punitive damages were unlikely where the amount alleged was unchallenged. Unlike GEICO's cases, Plaintiff assumes success on the merits but contests the evidentiary basis for GEICO's valuation. GEICO must first support its estimate of the compensatory relief sought by a preponderance of the evidence. The later legal-certainty burden cannot supply the missing initial showing. *Lizama*, 36 F.4th at 765–66.

**4. *Westerfield I* addressed a different pleading and different record.**

*Westerfield I* accepted the petition's typicality allegations in ***that*** case as a basis for using $2.20 as the alleged daily overcharge. 2026 WL 2144550, at *3–4. This Petition expressly requires rated-driver-addition transactions and defines the recoverable loss as attributable premium collected and retained after refunds and credits. Doc. 5 ¶¶ 48–51. Paragraph 57 distinguishes typical liability from average amounts and durations. The earlier ruling did not—and could not—determine whether its initial-charge proxy reasonably estimates the retained-premium loss defined here.

The Maryland Risk Alert proceeding documents GEICO's premium-calculation methods. GEICO's representative testified "all premium calculations for the Licensee's policyholders are ***automated***." Doc. 30-6 at 17. The decision explains GEICO uploads its rating rules into a computer program that calculates policyholders' premiums. *Id.* GEICO also manually verified the calculations for both the prior policy period and the renewal period. *Id.* The same proceeding shows retroactive driver removal, corrected premiums, and credits. *Id.* at 7–8, 15. These are documented calculations and adjustments arising from the very driver-addition process at issue.

GEICO has also agreed to change rating factors retroactively and perform historical recalculations on a massive scale. The July 2026 Texas order requires GEICO Advantage and other GEICO insurers to rerate over 13,000 policies using the correct VIN symbol factor, issue restitution, and report policy-level overcharges, restitution amounts, and payment or credit dates in a sortable electronic spreadsheet. Doc. 30-7 at 3–4.[8] In New Jersey, GEICO insurers completed rate-capping corrections covering up to three policy periods—18 months. Of 12,605 affected policies, 9,714 required refunds totaling $2,076,482.50; 2,891 had no adverse premium impact. All credits and refunds were issued by May 22, 2025. Doc. 30-9 at 2, 20.

This evidence undermines GEICO's reliance on the asserted burden of individualized calculations. Doc. 23 at 10 n.3. The records document programmed premium calculations, reconstruction of past policy periods, and completed corrections and refunds. Its assertion of burden supplies no evidentiary connection between the initial $2.20 charge and the premium collected and retained placed in issue ***here***. The Court must assess that connection with the present pleading and record. The earlier acceptance of a proxy cannot supply the financial support missing here.

The operative Petition defined these transactions and losses before removal. Jurisdiction turns on those allegations. *Hargis v. Access Cap. Funding, LLC*, 674 F.3d 783, 789–90 (8th Cir. 2012); *Raskas*, 719 F.3d at 888 n.1. The Petition likewise defines the "referral criterion" used to qualify for class membership rather than excluding every actual surname match. A License-Address addition requires an address match without requiring a surname match; a coincidental surname match remains within that definition. Doc. 5 ¶¶ 26–28, 49. The evidentiary defects identified above affect both populations Hoskins selected. Plaintiff relies on the class and loss limitations

[8] A separate Texas order required another GEICO entity to calculate corrected premiums for over 80,000 policies without the challenged zero-dollar-claim factor and report policy-level overcharges and restitution dates in a sortable electronic spreadsheet. Doc. 30-8 at 2–4.

contained in the Petition before removal, not on a post-removal amendment or subsequent refund. The requested records would establish the qualifying retained loss sought by the Petition.

The Eighth Circuit recently reaffirmed that under CAFA a plaintiff remains the master of the complaint and is fully entitled to define the scope of claims, theories, and parties in the operative pleading. *Vick v. Fresh Green, LLC*, 188 F.4th 1062, 1066 (8th Cir. 2026). This case involves no post-removal amendment: the substantive recovery was defined strictly as net retained premium after refunds and credits before GEICO Advantage removed it.

**5. Alternatively, the Court should allow limited discovery.**

GEICO's evidentiary gaps justify remand under *Lizama*, *CenturyLink*, and *K.A.* Alternatively, the Court should allow targeted jurisdictional discovery and supplemental briefing before ruling. Discovery would test which additions and days were rated and whether the financial rate reasonably estimates attributable premium collected and ***retained*** after credits and refunds.

GEICO's rating rules and the Maryland, Texas, and New Jersey records identify the procedures and financial inputs needed to test Hoskins's calculations. *See* §§ 2.2, 4 above. The New Jersey examination specifically requires policy-level spreadsheets identifying impact start and end dates, affected policy terms, refund amounts, and refund dates. Doc. 30-9 at 17, 19. Those fields correspond directly to the requested inquiry into rated periods and financial adjustments

GEICO's public filing in *Kane* identifies more fields worthy of examination. GEICO Casualty described a driver-level spreadsheet whose premium-change entries could combine a driver addition with other policy changes. *Kane v. GEICO Cas. Co.*, No. 6:25-cv-00532-JSS-LHP (M.D. Fla.), Doc. 79 at 3–5. GEICO described the earlier *Westerfield* data as functionally similar. *Id.* at 5–6, 10. Production of *Kane*-like data and GEICO's current extract and field definitions would show how its calculations address its evidentiary gaps.

Discovery should begin with the existing extracted data that GEICO says is similar to *Kane*, data dictionary, queries, filters, date ranges, and supporting materials underlying each population in paragraphs 3, 5, and 6 of Hoskins's declaration. The production should identify the referral criteria, recorded response deadlines, status codes, and definitions used to select qualifying rated-driver additions. Effective-dated status histories would show rated days and how the calculations treated learner's-permit, other-insured, excluded-driver, and non-driver classifications.

GEICO should also produce Westerfield's billing, payment, and adjustment history. His transaction supplies the $2.20 daily "overcharge." The records would show the attributable charge, payments, refunds, credits, and retained balance. If necessary or preferred, a reasonable random sample from each population Hoskins used could test the attributable charges, payments, refunds, and credits as of the Petition's specified cutoff date. Where an endorsement combined several changes, the sample should use the historical rating inputs and applicable rating version to recalculate the premium without the challenged driver, preserving unrelated policy facts while recalculating factors affected by that driver. *See*, *e.g.*, Doc. 30-4 at 3; Doc. 30-6 at 6–8, 15, 17; Doc. 30-7 at 3-4; Doc. 30-8 at 2-4. Sampled events with no qualifying retained loss must contribute zero to the population estimate.

The requested approach follows *Scherrer*, where the court allowed jurisdictional discovery before accepting the insurer's extrapolation. 2018 WL 1508904, at *1–2.

Nor is this the speculative inquiry rejected in *Reitz v. Nationstar Mortg. LLC*, 2012 WL 1656724, at *1–3 (E.D. Mo. May 10, 2012), a personal-jurisdiction case involving overlapping corporate leadership and undisputed evidence of no forum contacts. *Westerfield I* likewise relied on *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 598 (8th Cir. 2011), in finding no unknown or disputed material facts justifying discovery. 2026 WL 2144550,

at *6. Plaintiff now identifies the unknown and disputed jurisdictional facts as to the amount in controversy, the records bearing on them, and the calculation procedures that can test them. Limited production and supplemental briefing would allow an informed jurisdictional ruling.

## CONCLUSION

GEICO has not supplied evidence supporting the necessary connections between listed drivers and rated drivers, elapsed listing days and rated days, or initial charges and attributable premium collected and retained. Its calculations therefore fail to establish the jurisdictional amount by a preponderance of the evidence. The Court should remand this action to the Circuit Court of St. Louis County, Missouri. Alternatively, it should allow the limited jurisdictional discovery described above and supplemental briefing before ruling on the motion.

**ONDERLAW, LLC**

By: *_/s/ Martin L. Daesch_*
Martin L. Daesch, #40494 (MO)
Jesse B. Rochman, #60712 (MO)
110 E. Lockwood Ave.
St. Louis, MO 63119
(314) 963-9000 (telephone)
daesch@onderlaw.com
rochman@onderlaw.com
*Attorneys for Plaintiff*

## Certificate of Service

I certify that on November 5, 2026, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all attorneys of record.

*_/s/ Martin L. Daesch_*